WESTERN STATE BANK OF SOUTH BEND, INDIANA *v.* FIRST
UNION BANK & TRUST CO. OF WINAMAC, INDIANA.

[No. 3-175A5. Filed February 28, 1977.]

*Jere L. Humphrey, Chipman, Morrison & Humphrey,* of
Plymouth, for appellant.

*F. E. Rakestraw, Brown, Brown & Rakestraw,* of Rochester,
for appellee.

GARRARD, J.—This appeal attacks a determination by summary judgment that First Union Bank & Trust Co. of Winamac (Union) was entitled to the status of a holder in due course (HDC) with respect to five certificates of deposit (C/D's) issued by Western State Bank of South Bend (Western).

·· The pleadings and other materials before the court asserted the following factual background. One certificate was dated May 20, 1969. The others were dated June 2, 1969, and all were numbered. Numbers 145, 150 and 151 were payable to Stanley J. Blenke and Geraldine L. Blenke. Numbers 152 and 153 were payable to John Blenke. Together they totalled $17,000. All were prepared on preprinted forms inscribed with Western's name. In the lower left corner each contained the preprinted statement, "— months after date with interest to maturity at the rate of — per cent per annum." All five were filled in to read, "*None* months after date with interest to maturity at the rate of *none* per cent per annum." Nothing else on the form referred to either the interest rate or maturity date. Apparently the C/D's were to be retained by Western as security for a separate loan made by Western to O. F. Helvie. Somehow, however, the Blenkes secured possession of the C/D's and subsequently used them to collateralize a series of new loans with Union. When the C/D's were delivered to Union each was properly indorsed by the appropriate payee(s). When Union later presented the C/D's for payment its demand was refused, and when it commenced suit Western asserted its contractual defenses. Union replied asserting the rights of a HDC. *See,* IC 1971, 26-1-3-305. (Hereafter citation is limited to the section number of chapter 3, which corresponds to the Uniform Commercial Code designation.)

· Ultimately Union moved for summary judgment. This motion was granted. The only issue presented on appeal is

whether the trial court should have found there was a genuine issue of material fact as to whether Union was a holder in due course. Union's affidavit that it took the C/D's without actual knowledge of Western's claim or defense is uncontroverted. Western's sole contention is that the statement on the C/D's that they were payable "none months after date" and were to bear interest "at the rate of none per cent" constitutes a sufficient irregularity under § 304(1)(a) to create a genuine issue regarding Union's HDC status. This provision states:

> "(1)  The purchaser has notice of a claim or defense if (a)  the instrument . . . is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay,"

While the general notice provision of the Code, IC 1971, 26-1-1-201(25), imposes subjective and quasi-objective standards,[1] § 304 imposes an objective standard. *See,* Note, *Notice and Good Faith Under Article 3 of the Uniform Commercial Code,* 51 Va. L. Rev. 1342 at 1352. In *First National Bank of Linton* v. *Otto Huber & Sons, Inc.* (USDC, DSD, 1975), 17 U.C.C. Rep. 147, 151, the court concluded there was an irregularity sufficient to impart notice under § 304(1)(a) where,

> "A reasonably prudent person exercising normal commercial standards would immediately be put on notice that there was something very irregular about the terms of the note."[2]

The gist of Western's argument is that the terms of the contract contained in the C/D's so deviated from the custom or usage of the banking industry as to constitute an "irregu-

---

1.  Note, *Holder in Due Course: The Requirements of Good Faith and Notice,* 28 Md. L. Rev. 145 at 153; *cf. Bowling Green, Inc.* v. *State Street B. & Trust Co. of Boston* (1969), 307 F. Supp. 648, *aff'd* (1970), 425 F. 2d 81.

2.  Our agreement with the quotation does not signify approval of the holding in that case. *See, also,* Indiana comment (1) to § 304 stating *inter alia,*

"To the extent that this section is applicable to defenses it probably changes the rule under the N.I.L. (§ 56) requiring [actual] knowledge or bad faith."

larity" under § 304(1)(a), i.e., an irregularity such "as to call into question [their] *validity, terms or ownership or to create an ambiguity as to the party to pay.*"

§ 104(1) sets forth the elements to make an instrument negotiable. It must be signed by the maker or drawer; contain an unconditional promise or order to pay a sum certain in money; be payable on demand or at a definite time; and be payable to order or bearer. § 104(2)(c) provides that an instrument which complies with the foregoing is a "certificate of deposit" if it is an acknowledgment *by a bank* of receipt of money with an engagement to repay it. The instruments sued upon comply in all respects with these requirements of § 104(1) and (2)(c).[3]

Western argues that the provisions of Regulation Q of the Federal Reserve Board, 12 C.F.R. 217 (as amended effective February 12, 1970) establish an irregularity questioning the validity of a certificate of deposit if the certificate purports to be payable on demand or without notice. Western errs in this assertion. The regulation does *not* require that a certificate of deposit bear interest or have a maturity date at least thirty days after the date of the instrument. Instead the regulation divides deposits which may be the subject of such certificates into two classifications: demand deposits and time deposits. § 217.1 of the regulation defines a *time* certificate of deposit as one payable not less than thirty days after the date of the deposit, and subsequent paragraphs govern the payment of interest on such certificates. However, § 217.1 (a) also recognizes demand deposits, and § 217.2 *prohibits* the payment of interest on any demand deposit. Accordingly, the regulation does not sustain Western's claim of irregularity or disclose the existence of a genuine issue of fact.

Two points remain. First, Western asserts that the affidavit of its cashier which states "said certificates were irreg-

---

3. § 108 provides, "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated."

ular" should transcend the reason assigned (Regulation Q) and create a material issue. We think not. Aside from the fact that the regulation was assigned as the reason for irregularity, the statement is a legal conclusion which could not be testified to at trial. *See* TR. 56 (E).[4]

Union argued in its brief that as a matter of law the form of these certificates could not be found to be irregular. This also is in error. Although Western made no such allegation nor was it presented by the materials before the court, we cannot say that custom and usage could not make these instruments irregular.

The comments to 3-304(1)(a) indicate that its primary concern is with defects or deficiencies which suggest foul play (e.g., alterations) or inadvertence (e.g., incompletions) and are apparent on the item without reference to extrinsic facts. Such defects, it might be argued, are therefore distinguishable from the "irregularity" alleged in this case which only takes on meaning with reference to an extrinsic fact—the customs or usage of the banking industry. However, the fallacy of such a distinction is apparent. An alteration or incompletion can itself give notice only because it is a deviation from the norm and because, in general experience, such deviations usually indicate an infirmity in the item. In short, 3-304(1)(a) does not contemplate purely intrinsic "irregularities."

Further, the language of the section discloses a broader intent. Subsection (a) refers to incomplete items, items with "visible evidence" of forgery or alteration and those which are *"otherwise irregular."* We cannot say, as a matter of law, that the contract terms of an item could never so clearly contravene established banking practices as to cause a reasonable man to question its "validity, terms or ownership or to create an ambiguity as to the party to pay."

4. To the extent an expert might be permitted to testify to such an opinion, the affidavit fails to establish the qualifications of the affiant as an expert.

However, there is a distinction to be made as to the customs or usages that the Code imputes to the reasonable man under 3-304(1)(a). The specific provisions imply that a reasonable man would know that an incompletion or an obvious alteration or forgery is a deviation from the norm. However, where the deviation is said to exist due to some special custom or usage, there arises a collateral issue of fact concerning the existence of that custom or usage and whether a reasonable man *in the position of the actor* would have knowledge of it.

This distinction, in turn, raises the issue as to which party has the burden of proving the existence of such a special custom or usage and its imputation to the reasonable man. 3-307(3) provides:

"After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."

In Official Comment No. 3 it is said:

" 'In all respects' means that he must sustain his burden by affirmative proof that the instrument was taken for value, that it was taken in good faith, and that it was taken without notice (Section 3-302)."

1-201(8) states:

" 'Burden of establishing' a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence."

Arguably, the person claiming HDC status would have the burden of proving either the *non*-existence of a custom or usage from which the contract terms deviate or that knowledge of such custom, if it did exist, could not be imputed to a reasonable man in his position.

An examination of the purpose and operation of HDC status under the Code persuades us, however, that the draftsmen intended no such result. The purpose of conferring HDC status is to encourage and facilitate the circulation of commercial paper.

"It is sometimes said that the holder in due course doctrine is like oil in the wheels of commerce and that those wheels would grind to a quick halt without such lubrication." White and Summers, *Uniform Commercial Code,* p. 457.

It permits a specified class of holders to receive negotiable instruments free of the risks of claims or defenses which might be valid against the original recipient. These risks are twofold. First, the HDC is assured that he will not lose any action brought to enforce the instrument due to such claims or defenses. This is the substantive effect of the rule. Second, and perhaps just as important, the holder is assured that should he acquire HDC status he will not incur high transaction costs in the form of protracted litigation when seeking to enforce the contract. This is the procedural effect of the rule. The purpose of the rule would be largely defeated if one seeking HDC status could be frequently compelled to meet a difficult burden of proof concerning his entitlement to the protected status.

To prove that the contract terms of an item did not deviate from any custom or usage would carry all the difficulties which attend proving a negative. Transferees would seek to avoid such a burden and the flexibility and, consequently, the utility of commercial paper would decrease. We do not believe that the draftsmen of the Code intended such a result, nor does the specific language of the Code require it.

We note that 1-103 provides:

"Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

The general rule is well established in Indiana that he who would avail himself of a custom or usage has the burden to establish its existence. *City Dairy Co.* v. *Uservo* (1936), 101 Ind. App. 375, 199 N.E. 457. We therefore hold that where a

party claims that an irregularity exists because of a custom or usage which is not directly implied by the specifics of § 3-304(1) (a), he has the burden of proving the existence of such custom or usage.

It may be that once the existence of the custom or usage is established, the party claiming HDC status must show either that the instrument does not deviate from it or that the deviation is not so substantial and conspicuous as to cause a reasonable man to "call into question" the instrument. However, we need not decide that issue because we hold that the court correctly granted summary judgment due to the lack of a material issue of fact concerning the existence of the alleged custom or usage.

There was no contention by allegation or by the materials presented to the court that any such custom or usage existed in the banking industry relevant to these proceedings. TR. 56(C) provides that when summary judgment is moved and supported as provided in the rule:

"Summary judgment shall not be granted as of course because the opposing party fails to offer opposing affidavits or evidence, *but* the court shall make its determination from the affidavits and testimony offered *upon the matters placed in issue* by the pleadings or such evidence." (emphasis added)

In addition TR. 56(E) specifies:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, *but his response,* by affidavits or as otherwise provided in this rule, *must set forth specific facts showing* there is a *genuine* issue for trial." (emphasis added)

Western neither urged nor demonstrated any issue of custom or trade usage apart from Regulation Q which would render the instruments irregular under Section 304(1) (a). The other materials established that Union was a holder in due course and entitled to judgment.

Affirmed.

Staton, P.J. and Hoffman, J., concur.

NOTE.—Reported at 360 N.E.2d 254.